Filed 11/8/13  Fox v. Knopp CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MICHAEL ERIC FOX,<br><br>    Petitioner, Respondent, and Appellant,<br><br>    v.<br><br>KAREN ANNE KNOPP,<br><br>    Respondent, Petitioner, and Respondent. | B240449<br>B243848<br>B242041<br>B242042<br><br>(Los Angeles County<br>Super. Ct. Nos. PQ012168, LQ013051) |

APPEALS from orders of the Superior Court of Los Angeles County.  Steff R. Padilla, Commissioner.  Affirmed.

Michael E. Fox, in pro. per., for Appellant.

Bradley Dale Tubin for Respondent Karen Anne Knopp.

_____

In these appeals, attorney Michael Fox challenges four trial court orders from two related but unconsolidated cases: (1) a restraining order against Fox, issued to his former girlfriend, Karen Knopp (Appeal 1); (2) an order terminating Fox's restraining order against Knopp (Appeal 2); (3) an order denying Fox's requests for restitution under Family Code section 6342, subdivision (a) (Appeal 3); and (4) an order granting Knopp's motion for attorney fees (Appeal 4). On our own motion we have consolidated the four appeals for argument and opinion. We affirm the trial court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

We summarize the facts in accordance with the usual rules on appeal. Specifically, we review the record in the light most favorable to the orders and resolve all evidentiary conflicts in favor of the prevailing party. (*Burch v. Premier Homes, LLC* (2011) 199 Cal.App.4th 730, 744.)

### *Early Incidents*

Karen Knopp and Michael Fox started dating in 2007. Fox moved in with Knopp in 2009. According to Knopp, several incidents occurred during their relationship that made her fear Fox. On one occasion in December 2009, the two argued. Knopp had attended a work party that was for employees only. Fox grew angry that Knopp did not contact him or meet him that night. The next morning, while Knopp was sitting on a bed, Fox yelled at her, grabbed her shoulders, pushed her backward, then pushed her toward the bathroom, all while screaming. Knopp was afraid. Fox's grasp on her arms left bruises. On two other occasions in 2009, Fox grew angry or hostile because of another person's behavior, but then pushed Knopp, berated her, or directed other angry behavior at her.

In March 2011, Fox grew angry when Knopp went out with friends instead of waiting for Fox to come home. The next day, Knopp approached Fox while he was in a closet, in an attempt to resolve the problem. Fox screamed at Knopp, then pushed her away, out of the closet. He hit her hands away when she gestured. Knopp was afraid.

2

*London Incident*

In late April 2011, Fox accompanied Knopp on a business trip to London. Fox made Knopp "miserable" by pushing her, shoving her, telling her she was inconsiderate, and "blaming things on [her]." Fox complained that Knopp had not put him on the title to the house she owned in Los Angeles. The two argued, including about money. According to Knopp, Fox was "mean" and "angry" that Knopp had not kept him apprised of her whereabouts while she was working. Knopp wanted Fox to get his own hotel room.

According to Knopp, on the evening of May 1, both she and Fox consumed multiple alcoholic beverages. During dinner, they began to argue. Knopp told Fox he was too aggressive and abusive, he needed help, and she could no longer be with him. Fox grew increasingly angry. The two continued to argue. Knopp left Fox alone at dinner and returned to her hotel. Fox entered the room later. Knopp told Fox she wanted him to leave. The two argued. Knopp picked up Fox's suitcase, Fox grabbed the other side, and items fell out of the suitcase. Fox began repacking the suitcase. Knopp grabbed another bag to move it to the door. Fox pushed Knopp with his shoulder and pinned her against a cabinet. Knopp was stuck, but eventually broke free. Fox told Knopp she had hit him and he was bleeding. Knopp responded she did not hit him, and she did not see any blood.[1] Fearing what Fox might do, she fled from the room. Her leg was bruised from being pinned against the cabinet. London police officers came to the hotel. They arrested Knopp on domestic violence charges.

On May 5, Knopp e-mailed Fox and asked him to move out of her house. On May 7, Fox sent Knopp a text message telling her he loved her. On May 8, Fox sent Knopp another text message stating: "I tried. If at any time you want to change course, then please contact me to discuss how we could save our relationship. I do love you."

---

[1] At the evidentiary hearing, Knopp admitted it was possible her hand struck Fox's body. She did not know what caused his bloody nose, but said she did not see him bleeding, did not intentionally hit him, and did not intend to cause his nose to bleed.

On May 8, Fox also responded by e-mail to Knopp's request that he move out. The message began: "I have tried to reach out to you to discuss what happened between us. I had hoped that we could talk before making any decisions that will negatively impact our relationship. Despite my hopes, however, it appears that you do not want to talk and have chosen your path. Unfortunately, this leaves me no option but to respond to your May 5 e-mail with this e-mail and to take all steps necessary to protect my interests. My response, which I honestly wish that I did not have to write and which I write with a heavy heart, follows." The remainder of the message indicated Knopp's house was also Fox's home; Knopp had no legal right to evict him; even if she could evict him, she had failed to give him 60 days to vacate as required under California law; Civil Code section 789.3 prohibited her from exercising any "self-help" remedies such as removing his possessions, and, if she did so, she would be liable for costs and damages, or criminally liable for theft under Penal Code section 484; and her request that he vacate in three days' time was unreasonable.

Fox further recounted his version of the London incident and attached a photograph depicting his bloody nose. He warned she had no right to show the photograph to anyone or disseminate it, and, if she did, her actions "may give rise to monetary damages in a civil action." The e-mail suggested Knopp had taken his watch. He asked that she return it, warning that if she did not do so, "I will take all steps necessary to protect my interests, including, but not limited to, filing a complaint with the police and a civil action for recovery." Knopp considered the e-mail very aggressive.

### *Knopp Temporary Restraining Order*

1. Petition & Temporary Restraining Order

On May 10, 2011, Knopp filed an ex parte request for a restraining order against Fox, pursuant to the Domestic Violence Prevention Act (Fam. Code, § 6200, et seq.; DVPA). In an accompanying declaration, Knopp recounted a version of the London incident and declared Fox had previously called her names, pushed her, slapped her hands, and spit in her face. She alleged Fox had pinned her oldest son to the floor in August 2010. Knopp requested that the court order Fox to move out of the house she

4

owned, and indicated she feared encountering Fox in the house as he had a handgun. She declared she had not been home since returning to the United States. The court issued temporary restraining orders, and set a hearing for June 1, 2011.

2. Fox Opposition & Request for Costs

On May 19, 2011, Fox filed an answer opposing the request. Fox denied all of Knopp's allegations. He asked the court to order Knopp to pay his attorney fees and out-of-pocket expenses, asserting the temporary restraining order was issued without enough supporting facts. Fox alleged it was in fact Knopp who had abused him in London, and who continued to harass him by demanding he move out and by seeking a restraining order on false information.

3. Hearing, Dissolution of Order, & Attorney Fee Award

On May 31, the day before the hearing, Knopp sent Fox a message indicating she would not appear at the hearing and would let the temporary restraining order dissolve. On June 1, 2011, the court held an Order to Show Cause hearing on Knopp's petition. Knopp did not appear. Fox appeared with counsel. The court dissolved the temporary restraining order against Fox, dismissed the case without prejudice, and granted Fox's request for $1,000 in attorney fees. The court denied Fox's request that the records in the matter be sealed.

***Fox Restraining Order Against Knopp***

1. Petition

On June 13, 2011, Fox filed his own petition seeking DVPA personal conduct, stay away, and move out orders against Knopp. In an accompanying declaration, Fox reported Knopp began abusing him in 2010, with the abuse escalating in 2011 and leading to the London incident. Fox declared Knopp screamed at him, insulted him, cornered him, blocked his movements, and waived her hands in his face in a threatening manner. Fox recounted that during their London trip, Knopp grew increasingly irritable, aggressive, and hostile with Fox, took his wristwatch she had previously given him as a present, and eventually accosted him in their hotel room, throwing his possessions into the hallway. As Fox frantically tried to call Knopp's father (in the United States) for

5

help, Knopp tried to grab Fox's phone, hit him, kicked him, and punched him in the face, causing his nose to bleed. Fox asserted that because he declined to press charges against Knopp, she was released from custody in London. Fox secured his own hotel room and returned to Los Angeles the next day. Fearing Knopp, he fled to his mother's house in Houston, Texas.

Fox declared Knopp obtained a temporary restraining order against him to harass him and retaliate for her arrest in London. Fox asserted Knopp continued to harass him by refusing to grant him access to the house where they had previously lived together.

2. Request for Restitution

Fox also sought orders requiring Knopp to pay his monthly mortgage, tax, insurance, and utility payments, totaling $9,000 per month; attorney fees and costs; and out-of-pocket expenses and lost earnings caused by Knopp's alleged abuse. His expenses included London hotel costs; the cost of his flight to Houston; the cost of flying his mother from Houston to Los Angeles to help him move; temporary housing and storage costs; professional packing and moving services; a handgun storage fee since he had to relinquish his firearm due to Knopp's temporary restraining order against him; and the cost of renting a post office box. He also sought reimbursement for expenses he incurred in responding to Knopp's temporary restraining order petition, including the cost of flying his mother to town to testify, paying for his mother's hotel accommodations, and court parking for three witnesses who appeared in court to testify on his behalf.[2] Fox identified over $8,300 in out-of-pocket expenses. In addition, he sought over $1,000 in costs associated with his petition for a restraining order against Knopp.

Fox further sought lost earnings. According to Fox, he was unable to work because he "fled" to his mother's house in Texas to avoid Knopp. He could not work from his home office once Knopp's temporary restraining order went into effect. Fox alleged he was unable to work for nearly one month because he was forced to arrange new accommodations, move, and respond to the temporary restraining order, and

---

[2] The record does not indicate any testimony was taken at the hearing.

6

therefore had "virtually no time" to commute from Valencia to his office in Irvine. Fox asserted he was terminated from his law firm job due to his extended absence from work, and he was no longer employable because of the record of the temporary restraining order. He requested that the court order Knopp to pay restitution of no less than $20,000 per month.

3. Issuance of Temporary Restraining Order

On June 14, the court issued a temporary restraining order against Knopp. The court granted personal conduct and stay away orders, but did not grant Fox's request for a move-out order. Knopp did not appear in court. The court set a July 6 hearing.

4. Fox Supplemental Request for Restitution

On July 6, Fox filed a supplemental declaration seeking additional expenses and future costs he attributed to Knopp's abuse, such as court filing fees, copying charges, storage fees, court parking, fees for retrieving his handgun and obtaining firearm related documentation, and fees associated with an application to expunge or seal court records.

5. Knopp's Failure to Respond & Issuance of Restraining Order

Knopp was served with the restraining order on June 30. She did not respond to the petition for a restraining order, or appear at the July 6 hearing. Fox told the court he felt his safety was still at risk. The court issued a five-year restraining order against Knopp. However, the court continued the hearing on Fox's request for restitution to August 11.

***Fox Motion for Restitution & Motion to Modify the June 1 Attorney Fee Award***

On July 15, Fox filed a formal motion for an order compelling Knopp to pay lost past and future earnings ($48,300 past; $20,000/month future), and out-of-pocket expenses he incurred as a result of Knopp's abuse ($8,090), as well as the cost of replacing his wristwatch ($650), and legal costs incurred in filing the restitution motion. Although the court had previously awarded him $1,000 in attorney fees, Fox now asked the court to order Knopp to pay an additional $1,000 so that he might recoup the full $2,000 he paid his attorney to defend him against Knopp's restraining order petition.

7

Fox separately filed a motion to modify the court's June 1 order. Fox asked that the payment be made directly to Fox, instead of to his attorney. Fox also asked the court to order Knopp to pay $2,000, instead of $1,000, arguing the court committed legal error in awarding only a portion of his fees.

***Knopp Motion to Set Aside the Fox Restraining Order Against Her***

1. Motion

On September 20, Knopp filed a motion to set aside Fox's restraining order against her. Her application requested the following relief: "Request to set aside 07-06-11 restraining order after hearing taken against respondent for her mistake, inadvertence, surprise, and/or excusable neglect. Alternatively, equitable power of this court." Knopp contended she was served on June 30, the day before the fourth of July holiday weekend and only two full court days before the scheduled hearing on Fox's restraining order petition. It was also the day she was leaving for a pre-planned vacation in Hawaii. Although she attempted to contact and retain an attorney, she was unable to do so before the July 6 hearing. In the body of the motion, Knopp requested that the court either set aside the order entered by default due to Knopp's mistake, inadvertence, or surprise and/or excusable neglect, or exercise its equitable power to set aside the default due to extrinsic fraud or extrinsic mistake. Knopp contended the policy of allowing litigants their day in court was appropriately applied given "Knopp's contention that Mr. Fox was the perpetrator of domestic violence on the night of the incident in question, which formed the basis for Mr. Fox's restraining order."

2. Proposed Answer

Knopp simultaneously filed a proposed answer to Fox's petition for a restraining order. In the proposed answer, Knopp denied ever threatening or attacking Fox. She denied his version of the London incident. She further contended that even if some of Fox's allegations were true—such as verbal altercations at public places—they did not rise to the level of domestic violence. Knopp declared she did not proceed with obtaining a permanent restraining order against Fox because his family members had contacted her and pleaded with her not to for fear that it would harm Fox's legal career.

8

3.  Fox Motion to Strike Proposed Answer

On October 3, Fox moved to strike Knopp's proposed answer to his restraining order petition.  Fox asserted Knopp improperly filed the answer, instead of merely including a proposed answer with her set-aside motion.  Fox also contended Knopp's answer and a supporting declaration contained statements that were improper "inadmissible lay opinion testimony," false, or improper because Knopp lacked personal knowledge to make the statements, or the statements were hearsay.

4.  Fox Opposition to Set-Aside Motion

On October 13, Fox filed an opposition to Knopp's motion to set aside the restraining order against her, and evidentiary objections to the Knopp declaration supporting her set aside motion.  Fox contended Knopp was delinquent in retaining counsel, her set aside motion was untimely, she had not shown mistake, inadvertence, surprise, or excusable neglect, and the interests of justice would be abused by allowing her to belatedly respond to his restraining order petition.

### Knopp's Second Petition for a Restraining Order Against Fox

1.  Petition

On October 13, Knopp filed a new request for a restraining order against Fox. In an accompanying declaration, Knopp declared Fox had a history of swearing and screaming at her, calling her foul names, pushing her, spitting on her, throwing items at her, and grabbing her hard enough to cause bruises.  Knopp declared Fox had contacted her even after obtaining the restraining order against her.  According to Knopp, Fox sent her a text message and called her.  Knopp's sister saw Fox at a UCLA football game at which he sat around eight rows away from Knopp's sister's season ticket seats.  Knopp declared Fox knew she attended most games with her sister, and he knew the location of her sister's seats.  Knopp further declared she had decided not to proceed with obtaining a restraining order in May 2011 after speaking with Fox's mother, who pleaded with her not to, and after speaking with a friend who reported Fox said he would "bury" Knopp in litigation if she continued to seek a permanent restraining order.

9

Knopp additionally recounted several incidents which took place between 2009 and 2011, in which Fox allegedly demonstrated violent anger, either toward Knopp, or in connection with her.

2. Fox Opposition

On October 13, Fox filed an opposition to Knopp's petition. Fox argued he had not seen or spoken to Knopp since May 2011. He contended Knopp could not show immediate danger, risk of irreparable harm, or any recent abuse. Fox declared that while he attended the UCLA game in question, he did not encounter anyone in Knopp's family and made no attempt to do so. He asserted the text message was the result of a "mechanical mishap" with his phone. He also denied ever calling Knopp, although he allowed his phone may have inadvertently called her ("pocket-dialed").

3. Court Hearing on Temporary Orders

At the October 13 hearing, the court declined to enter temporary restraining orders against Fox and instead set the matter for hearing on October 26. The court indicated one issue at the next hearing would be whether there was sufficient basis to continue Fox's restraining order against Knopp if he was in fact violating it himself by contacting her.

4. Fox Answer and Further Opposition to Knopp Petition for Restraining Order

On October 19, Fox filed an answer to Knopp's "renewed" request for a restraining order, and a second opposition to the request. His answer included evidentiary objections to Knopp's declaration. The opposition was accompanied by a declaration from Fox's brother attesting to Fox's good nature, the brother's failure to ever observe Fox acting aggressively or violently with Knopp, and refuting portions of Knopp's declaration. Fox also submitted declarations from three friends who indicated they had never seen Fox display any anger or aggressive behavior towards Knopp. All three declared they had observed Fox had "moved on with his life," he did not want to communicate with Knopp, and he had a new girlfriend.

10

*Evidentiary Hearing*

Knopp's petition for a restraining order and motion to set aside Fox's restraining order were set for hearing. On December 7, the trial court denied Fox's application to have the records sealed from Knopp's first restraining order petition. At ten court sessions between December 7, 2011 and January 24, 2012, the court heard testimony from Knopp, Fox, Knopp's son, and Fox's new girlfriend. The court accepted into evidence the declarations of Fox's brother and friend, in lieu of their testimony.

Knopp's adult son, Hunter Knopp, testified about an altercation he had with Fox in 2010. Hunter described Fox as angry and physically intimidating. According to Hunter, when he did not remove a shooting target Fox had asked him to take down, Fox grew increasingly angry, used expletives, then grabbed Hunter, spun him around, and grappled with him. Hunter recounted he was "terrified," and his girlfriend was screaming; both told Fox he could not touch Hunter in that way. Hunter further testified he witnessed Fox yelling at Knopp multiple times a week, and heard Fox calling his mother a "bitch" or telling her to "shut the fuck up." On cross-examination, he admitted he had never seen Fox hit, push, or shove Knopp, or act physically aggressive with Knopp. Hunter said he was afraid of Fox because Fox held grudges, had always been intimidating, and does not give up.[3]

Knopp testified about Fox's prior abusive behavior and the London incident. She said she did not respond to the Fox restraining order paperwork right away because she felt overwhelmed, although she attempted to find counsel while in Hawaii. She explained she renewed her request for a restraining order because she was "constantly getting paperwork" from Fox, which felt like constant contact. In addition, the text

---

[3] On cross-examination, Fox elicited testimony regarding Hunter's membership in a band that had morally repugnant song lyrics posted online. Fox also elicited testimony suggesting Hunter depended on Knopp for financial support. Fox asked questions intended to show that Hunter resented him. Hunter admitted that at the time of the incident with Fox, he was shooting a pellet gun at a target in the direction of a neighbor's house. He also admitted that Fox did not pin him to the floor, as alleged in Knopp's declaration supporting her petition.

11

message, telephone call, and UCLA game, were "too much," and she wanted to be left alone. Knopp said she was afraid of Fox. However, she admitted Fox moved out of her house in May 2011. He had not attempted to move back into the house, he had never shown up at her place of employment or threatened to do so, and he had not caused her any physical harm since her restraining order was dissolved. She also admitted the two had not spoken outside of the courthouse since May 2, 2011, in London. Knopp denied any knowledge that Fox's employer might monitor his e-mails, and denied that her e-mail to his work address asking him to move out was intended to alert his employer to their personal problems.

Fox's closing argument took place over three afternoon court sessions. Fox argued Knopp acted out of revenge and to save face. He contended her accounts of his violent behavior prior to May 2011 were false, refuted by his witnesses' declarations, proven false by certain details he had demonstrated were incorrect, rendered incredible by the fact that she allowed him to move in with her after the events allegedly occurred, and her versions were uncorroborated by any independent evidence. He argued her account of the London incident was false, as refuted by, among other things, photographs indicating they were having a good time on the trip, and evidence showing her statements about even minor details – such as what they ate for dinner – were false. Fox additionally asserted Knopp had no evidence of any recent abuse or even recent contact. He argued his witnesses uniformly indicated he was not a violent or aggressive person, including his new girlfriend.

Fox described Knopp's anger, which was directed at him, and which he attributed to Knopp's hormonal imbalance and PMS. Fox argued that during Knopp's menstrual cycle she would corner him, yell at him, get in his face, wave her hands in a threatening manner, and frighten him. He alleged this behavior caused him to flee the house, returning only after she was asleep.

During Fox's closing, the court again indicated it would consider whether to continue Fox's restraining order against Knopp, and invited him to discuss whether he believed she still posed a threat to him. Fox argued the court should deny Knopp's

12

request that it "exercise its equitable powers to terminate the restraining order" because he continued to fear she would harass and attack him. He explained: "While she has not physically battered me in the last six months, I believe that the restraining order has prevented her from doing so. On the other hand, she has sidestepped the restraining orders to continue her campaign of harassment against me by filing two frivolous restraining order actions based on false and fraudulent allegations. . . . I believe that if the restraining order had not been in place, then she would have pursued other means to harass me beyond filing frivolous lawsuits. Finally, she has given me threatening stares throughout the duration of this trial."

### Trial Court Ruling on the Restraining Orders

On January 24, 2012, the court terminated Fox's restraining order against Knopp. The court indicated it found Knopp credible, and it did not believe Fox's restraining order against her was still necessary. The court explained it did not believe Fox was afraid of Knopp or concerned about his safety. The court then granted a one-year restraining order against Fox, indicating Knopp established Fox had engaged in a pattern of abusive behavior that continued. On March 26, Fox filed a single notice of appeal from the trial court order dissolving his restraining order against Knopp, and issuing a restraining order against him.

### Knopp Request for Attorney Fees

Knopp subsequently requested that the court award her $20,000 in attorney fees, pursuant to Family Code section 6344. Fox opposed the request. Fox asserted Knopp had not disclosed all of her income or the value of her assets in her income/expense declaration. He contended she was financially capable of paying her own fees. In contrast, Fox asserted he was unemployed, "homeless," had no income except unemployment insurance benefits, and he had no prospects for future employment. He also argued the court could not award Knopp all of her attorney fees because, among other reasons, the trial was not limited to her request for a restraining order and not all of her costs were reasonably incurred.

13

*Trial Court Ruling on Restitution and Fees*

1.  Memorandum of Intended Decision

On April 13, 2012, the court issued a memorandum of intended decision on the attorney fee and cost issues.[4]  In the memorandum, the court found Fox had over-litigated the matter.  The court also concluded the matter required skill and restraint; Fox filed "various non meritorious motions in all cases"; and Knopp was the prevailing party in two of three cases.  The court awarded Knopp $10,000 in attorney fees.  It denied Fox's request for restitution, noting he failed to present any independent evidence that Knopp caused him to lose his job.  The court additionally ordered "all fees and costs are to be paid by both parties," and denied all other requests for restitution.

2.  Fox Objections and Response

On April 23, Fox filed a statement of controverted issues and proposals not covered in the tentative decision, and objections to the intended statement of decision. Fox asserted the court had not ruled on his motion to modify the June 1, 2011 attorney fee order, a motion to quash a subpoena Knopp issued before the evidentiary hearing, or the motion to strike Knopp's proposed answer.  Fox also contended the court had not signed an order allowing Fox to return to Knopp's home to retrieve the remainder of his belongings.  In his objections, Fox disputed the applicability of several legal authorities cited in the intended statement of decision.  He asserted the court abused its discretion in awarding Knopp attorney fees because he had no ability to pay them, and he did not have notice that fees would be awarded under various code provisions cited in the court's statement.  Fox further challenged the court's decision in part by making distinctions

---

[4]     The court's memorandum indicated: "The Memorandum of Intended Decision will be the Statement of Decision unless within ten (10) days either party files and serves a document that specifies controverted issues or makes proposals not covered in the Tentative Decision as provided by *California Rules of Court, Rule 3.1590(c).*  Pending further order or entry of Judgment, the Tentative Decision constitutes the temporary orders of the Court."  The memorandum concluded with the order: "The Clerk shall file the Memorandum of Decision and Statement of Decision; and it shall be entered on the register of actions.  Pending entry of a formal order or judgment, this order is effective when signed by the Court."

14

between costs that were, or were not, incurred in each "separate" proceeding, and by identifying alleged misstatements of fact in which the court implied there was only one case, rather than three.[5] Fox contended he, not Knopp, was not the prevailing party in two of three cases.

The record contains no response to the statement of controverted issues or objections. On June 15, Fox appealed from the attorney fee and costs order, in two separate notices of appeal.

## DISCUSSION

### I. The Trial Court Did Not Abuse its Discretion in Issuing a Restraining Order Against Fox (Appeal 1: B243848)

Fox challenges the restraining order issued against him. Fox contends: 1) collateral estoppel barred Knopp from "re-litigating" the London incident; 2) substantial evidence did not support the order; 3) the court made several incorrect and prejudicial evidentiary rulings; and 4) the court committed prejudicial judicial misconduct. We disagree and affirm the court's order.[6]

---

[5] For example, Fox disputed the court's statement that he had filed non-meritorious motions in all cases, in part because he "did *not* file *any* motions in LQ013051." He also argued Knopp did not establish she incurred any fees in connection with his motion to expunge or seal the record in the first "case" in which she obtained a restraining order against him, because the invoices before the court were limited to LQ013051.

[6] The restraining order against Fox has expired. The appeal from the order is therefore arguably moot. (*Environmental Charter High School v. Centinela Valley Union High School Dist.* (2004) 122 Cal.App.4th 139, 144.) We disagree with Fox's contention that review is still appropriate as a means to "clear his name." However, Fox has also appealed the trial court's award of attorney fees to Knopp in connection with the issuance of the restraining order against Fox. Although Fox's separate appeal of that order is based on arguments independent of the validity of the restraining order, we are mindful that were we to conclude the restraining order was improperly issued, the attorney fee award would also be invalid. For that reason, we consider this appeal. (*Carson Citizens For Reform v. Kawagoe* (2009) 178 Cal.App.4th 357, 365; *Viejo Bancorp, Inc. v. Wood* (1989) 217 Cal.App.3d 200, 205-206.)

15

### A. Collateral Estoppel

Fox contends Knopp's petition for a restraining order against him was "primarily based" on the London incident. As such, he argues the facts of that dispute were litigated and necessarily decided in his favor when the trial court issued the July 6 restraining order against Knopp. Fox asserts Knopp could not re-litigate that incident to support her own petition for a restraining order against Fox. Fox's argument is unavailing. As an initial matter, Fox forfeited any collateral estoppel defense by failing to assert it in the trial court. (*Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP* (2010) 184 Cal.App.4th 313, 332.) He cannot now argue the trial court erred by "ignoring collateral estoppel."

However, Fox also argues he could not raise collateral estoppel as a defense in the trial court because his July 6 restraining order was not yet final. He thus asserts this court should apply collateral estoppel for the first time on appeal to invalidate the Knopp restraining order against him.[7] (*First N.B.S. Corp. v. Gabrielsen* (1986) 179 Cal.App.3d 1189, 1195 (*First N.B.S.*).) We decline to apply collateral estoppel in the first instance on appeal. Even assuming we could properly consider the restraining order issued against Knopp as a separate action from her petition against him, and even if we agreed Fox was excused from raising collateral estoppel in the trial court because the ruling was not final until after the evidentiary hearing,[8] we would then conclude the issue was not resolved

---

[7]     In his opening brief in this appeal, Fox asserts he could not raise collateral estoppel because there was no final adjudication until the court denied Knopp's set-aside motion. Yet, in his reply brief in the appeal, Fox repeatedly contends the trial court abused its discretion in "ignoring" collateral estoppel principles to bar Knopp from re-litigating the London incident.

[8]     We note the time to appeal the Fox restraining order had expired when Knopp initiated her second petition for a restraining order against Fox. The Fox restraining order was issued and filed on July 6, 2011. Fox served the restraining order on Knopp on July 15, 2011. (Cal. Rules of Court, rule 8.104(a)(1)(B) [60-day deadline to appeal begins with service of file-stamped copy of appealable order].) Knopp had until September 13, 2011, to appeal the order. Fox cites no authority for the proposition that Knopp's set-aside motion, filed past the deadline to appeal, rendered the restraining order against her

16

ultimately in Fox's favor. (*First N.B.S., supra,* 179 Cal.App.3d at p. 1195 [when there are two *separate actions* in *different courts* involving the same issues and parties, the first final judgment may be collateral estoppel in the second action].) As discussed more fully below, the trial court terminated Fox's restraining order against Knopp. Although the court rejected Knopp's contention that her failure to respond to Fox's petition was excusable due to mistake or inadvertence, the court still terminated the restraining order against her. On this record, we would not find the facts of the London incident were litigated and decided in Fox's favor as a basis to invalidate Knopp's restraining order against him based on collateral estoppel.

## B. The Trial Court Did Not Abuse its Discretion in Issuing the Restraining Order Against Fox

Fox contends the trial court abused its discretion in issuing a DVPA restraining order against him because there was no substantial evidence of abuse. We find no abuse of discretion. (*S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1264 (*S.M.*).) Under the DVPA, the trial court may issue a restraining order "for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved, if . . . an affidavit and any additional information provided to the court pursuant to Section 6306, shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse." (Fam. Code, § 6300.) The DVPA defines abuse as " 'any of the following: [¶] (a) Intentionally or recklessly to cause or attempt to cause bodily injury[;] [¶] (b) Sexual assault[;] [¶] (c) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another[;] [¶] (d) To engage in any behavior that has been or could be enjoined pursuant to Section 6320.' (§ 6203.) The behaviors outlined in section 6320 include 'molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, including, but not

not final for collateral estoppel purposes, or more to the point, that this excused him from raising collateral estoppel in the trial court.

17

limited to, annoying telephone calls as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members.' (§ 6320, subd. (a).)" (*S.M., supra,* 184 Cal.App.4th at p. 1264.)

Knopp presented evidence at the hearing that Fox engaged in a pattern of violent and harassing behavior throughout their relationship, including yelling at her and pushing her. She offered evidence that he caused her bodily injury in London by pinning her against a furniture cabinet in their hotel room during an argument. She further offered evidence that when she asked him to move out of her house, he responded in part by asserting she could not force him to leave. She additionally offered evidence that since obtaining his own restraining order, Fox had called her telephone, sent her a text message, and appeared to be attempting to encounter her at a football game. This evidence was sufficient to allow the court to find past acts of abuse within the meaning of the statute.

Fox asserts Knopp's evidence was contradicted and not credible. However, we do not reweigh the evidence or second guess the trial court's credibility determinations. When the evidence supports two or more reasonable inferences, we accept the inference supporting the trial court order. (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613.) We disagree that Knopp's evidence was inherently improbable or physically impossible, or that its falsity was apparent "without resorting to inferences or deductions," such that we may disagree with the trial court's determination that the evidence was credible. (*Evje v. City Title Ins. Co.* (1953) 120 Cal.App.2d 488, 492.)

We also reject Fox's contention that the trial court improperly overruled his objections to Knopp's evidence of pre-2011 incidents. Fox asserts these incidents were irrelevant because they were too distant; some were irrelevant because they did not demonstrate abuse against Knopp; and some constituted improper character evidence. Yet, the court could reasonably conclude the challenged evidence was relevant, either to

18

show direct abuse against Knopp or to provide context for her allegations. Fox's objections to the evidence concerned its weight, not its admissibility.[9]

This was not a jury trial. The trial court did not abuse its discretion in concluding the probative value of evidence of pre-2011 incidents would not be outweighed by its potential prejudice. (*In re Jose M.* (1994) 21 Cal.App.4th 1470, 1481.) In addition, the record does not establish that Fox made any objections based on improper character evidence. His failure to object on that ground forfeits the argument on appeal.[10] (*SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 564-565; *People v. Doolin* (2009) 45 Cal.4th 390, 437 [relevance and Evid. Code, § 352 objection did not preserve argument that evidence was inadmissible under Evid. Code, §§ 1101 & 1102].)

We also disagree with Fox's contention that evidence of incidents prior to the London incident were not substantial evidence of abuse. For the reasons explained above, we reject the argument that evidence of incidents prior to May 2011 was not substantial because it was not credible. Further, we disagree that, to the extent the incidents formed a basis for the trial court finding that Fox had engaged in past acts of abuse, the finding was improper. Take, for example, two incidents Knopp testified about at the hearing: a 2009 incident in which Fox yelled at Knopp, grabbed her shoulders, and pushed her, and a 2011 incident in which Fox screamed at Knopp, pushed her, and hit her hands. These incidents were not exceedingly remote. They involved Fox's behavior

---

[9] The trial court did not err in refusing to take judicial notice of superior court or law enforcement websites stating that to secure a DVPA restraining order, the petitioner must have evidence of abuse occurring recently, or within 30 days. The trial court correctly stated the DVPA and corresponding case law would govern its decisions.

[10] Moreover, with respect to at least two of the incidents—Fox's altercation with a patron at a restaurant and his run-in with law enforcement during a river rafting trip—the trial court could reasonably conclude Knopp did not offer these incidents as evidence of Fox's propensity to engage in violent behavior. Instead, her declaration and testimony suggested that even though Fox was angry because of a situation unrelated to Knopp, his response was to verbally abuse *her*.

19

with Knopp. They described Fox engaging in acts of physical aggression against Knopp. The trial court could properly find these incidents were past acts of abuse, particularly when considered with *all* of the evidence.

In sum, the trial court did not abuse its discretion in issuing a restraining order against Fox.

### C. There Was No Judicial Misconduct

Fox asserts prejudicial judicial misconduct deprived him of a fair hearing. Claims of judicial misconduct must be raised in the trial court to be preserved for appellate review. (*People v. Snow* (2003) 30 Cal.4th 43, 78; *Metzenbaum v. Metzenbaum* (1950) 96 Cal.App.2d 197, 199-200.) Fox failed to object on this ground in the trial court, and has therefore forfeited the argument.

But even had Fox objected below, we would reject his claim. We have reviewed the record in its entirety and find no support for his contention. We have found no error in the trial court's rulings and thus disagree that the court was "unfaithful to the law." Fox asserts the court was intemperate with him. Yet, our review of the record suggests the court was in fact remarkably tolerant, given Fox's focus on minor impeachment details during cross-examinations, his persistence in arguing points the court indicated it did not find relevant or useful, and the leeway the court gave him in fully arguing his case over multiple court sessions. The court also repeatedly praised the efforts of Fox and Knopp's counsel. To the extent the court urged Fox to be more efficient, this was not judicial misconduct. (*Bates v. Newman* (1953) 121 Cal.App.2d 800, 810 [comments such as the trial had been "unduly prolonged," or "'You don't have to spend so much detail on it'" were not improper or prejudicial, even if preserved for review].) The record simply does not support Fox's assertion that the court tried to coerce a settlement, or that the court unreasonably interfered with witness examinations. Nor does it offer any support for his claim that the court was biased against him. There was no judicial misconduct.

20

## II.    The Trial Court Did Not Err in Terminating the Restraining Order Against Knopp (Appeal 2: B240449)

Fox asserts the trial court exceeded its jurisdiction in terminating his restraining order against Knopp because Knopp never moved to terminate the order. To the extent the court construed Knopp's set-aside motion as requesting termination of the order, and granted the motion, Fox asserts the court erred because the motion could not be so construed, Knopp did not show termination was warranted, and the trial court improperly shifted the burden of proof. In either case, Fox argues his due process rights to notice and hearing were violated. We find no error.

### A.  Background

The trial court granted Fox's petition for a restraining order against Knopp on July 6, 2011, after Knopp failed to oppose the petition or appear in court. On September 20, 2011, Knopp filed a motion asking the court to set aside the restraining order. The motion was based on Code of Civil Procedure section 473, subdivision (b). The notice of motion indicated Knopp asked the court to set aside the restraining order "after hearing taken against respondent for her mistake, inadvertence, surprise, and/or excusable neglect," or, in the alternative: "equitable power of this court."

By October 13, 2011, there were multiple matters before the court requiring hearing. Knopp's petition for a restraining order was set for hearing on October 26. At the October 13 hearing, the court indicated that at the October 26 hearing it would consider whether there was sufficient basis to continue a restraining order against Fox, in light of the allegation that he had contacted Knopp since the order issued. Later at the October 13 hearing, the court commented: "The only restraining order in effect at this point, however, is the court did grant Mr. Fox a restraining order, a five-year restraining order against Ms. Knopp. Whether or not that continues and where we go from here, we will have a hearing on that matter."

During Fox's closing argument on January 24, 2012, he argued against Knopp's petition for a restraining order, then stated he would turn his arguments to the set-aside motion. The court asked: "Are you prepared to argue whether or not I should dismiss?

21

Because you also ask for equitable relief for her restraining order - - for your restraining order against her not only to be set aside, but also for any and all equitable relief, and the court interpreted that to mean to include my ability to terminate because there is no longer a risk of threat to your safety and well-being." In response to Fox's remarks, the court clarified that Knopp had asked for that relief. The court advised Fox to argue the point, adding: "Okay? Whether or not you still believe that there is an ongoing threat to your safety and well-being for your restraining order against Ms. Knopp." As Fox began to argue Knopp had not established any inadvertence, mistake, or surprise, the court interrupted and indicated it would not grant the motion to set aside the restraining order due to mistake, inadvertence, surprise, or fraud.[11] But the court continued: "As to the issue as to whether or not to continue the temporary restraining order because you believe that you are still in threat of your well-being threatened by her actions and to continue the restraining order, you may argue that." The court interrupted again to ask: "Do you want an opportunity to argue as to why not that restraining order – because [Knopp's counsel] did ask for any and all equitable relief . . . ." Fox responded he felt the argument would be "covered by the remaining part of the presentation." The court answered: "Okay. I just want to give you an opportunity to argue that, because you did ask for equitable relief as to why shouldn't the court consider terminating the restraining order against her at this point, and the court pursuant to the Family Code can terminate at any time upon written motion and an opportunity to be heard, and if there has ever been a case pursuant to the Domestic Violence Prevention Act for this court to believe that both parties have had an opportunity to be fully heard on that issue, it's this case."

---

[11] The court indicated its "tentative" was to deny the set-aside motion, explaining: "There is nothing to indicate mistake, inadvertence, surprise, fraud. She knew she was supposed to be in court. She gives no legal excuse or reason why she was not in court. The motion to set aside, he doesn't need to argue that. He's well argued it, and I will give you an opportunity, [Knopp's counsel], to argue it again, but he's argued it again fully in briefs, and I don't need a Powerpoint presentation, Mr. Fox, to argue. It's been well-argued in your briefs. You can move on."

Fox did not immediately address the point. However, he later explicitly argued the question. Fox contended he continued to fear that Knopp would "harass and attack" him, and "while she has not physically battered me in the last six months, I believe that the restraining order has prevented her from doing so." He also asserted Knopp had harassed him by filing frivolous and false restraining order petitions; he felt that she would have harassed him further without the restraining order against him; and she had given him threatening stares throughout the trial.

## B. Applicable Legal Principles

Under Family Code section 6345, subdivision (a), a DVPA restraining order is "subject to termination or modification by further order of the court either on written stipulation filed with the court or on the motion of a party." As explained in *Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1503 (*Loeffler*), "[a] domestic violence restraining order is a type of injunction, as it is an 'order requiring a person to refrain from a particular act.' [Citation.]" Code of Civil Procedure section 533 explains when the court may modify or dissolve an injunction: "In any action, the court may on notice modify or dissolve an injunction or temporary restraining order upon a showing that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order."

It is well established that trial courts have inherent authority to modify or dissolve injunctions. As explained in *Sontag Chain Stores Co. v. Superior Court* (1941) 18 Cal.2d 92, 94, a preventative injunction, "although purporting on its face to be permanent, is in essence of an executory or continuing nature, creating no right but merely assuming to protect a right from unlawful and injurious interference. Such a decree, it has uniformly been held, is always subject, upon a proper showing, to modification or dissolution by the court which rendered it. The court's power in this respect is an inherent one. Its action is determined by the facts and circumstances of each particular case, with a view to administering justice between the litigants, and it has the

23

power to modify or vacate its decree when the ends of justice will be thereby served." (*Id*. at pp. 94-95; see also *Green Trees Enterprises, Inc. v. Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 788-789; *Union Interchange, Inc. v. Savage* (1959) 52 Cal.2d 601, 604-605; *Welsch v. Goswick* (1982) 130 Cal.App.3d 398, 404-405.)  We will not disturb a trial court ruling terminating a restraining order absent an abuse of discretion. (*Loeffler, supra,* 174 Cal.App.4th at p. 1505.)

### C.  The Trial Court Could Properly Construe Knopp's Set-Aside Motion as Alternatively Seeking Termination of the Fox DVPA Restraining Order

The trial court could properly construe Knopp's set-aside motion as requesting termination of the Fox restraining order as one form of potential relief.  As the court pointed out, in addition to seeking an opportunity to oppose the Fox petition for a restraining order, Knopp sought "equitable relief," and, more generally, to "set aside" the Fox order.  The court was not required to ignore the overall circumstances of this case in determining what Knopp meant in her request for other "equitable relief" in the set-aside motion.  In addition to the set-aside motion, Knopp also filed her own request for a restraining order against Fox.  Knopp's petition contended Fox not only engaged in past acts of abuse, he had continued to contact Knopp or attempt to encounter her, suggesting he no longer needed a restraining order to be protected from her.  Although Knopp's set-aside motion did not also reference Family Code section 6345, subdivision (a), under the circumstances the trial court could reasonably construe the set-aside motion as alternatively seeking termination of the Fox restraining order.

### D.  The Court Could Act on its Own Motion

Moreover, even if we view the court's termination of the Fox restraining order as an action taken on the court's own motion, we are not persuaded this was error.  Family Code section 6345, subdivision (a) describes DVPA restraining orders as subject to termination on written stipulation or on motion of a party.  However, that a statute does not expressly state the court may take a described action on its own motion does not necessarily mean the court is prohibited from doing so.

24

For example, in *Le Francois v. Goel* (2005) 35 Cal.4th 1094, our high court concluded that although Code of Civil Procedure sections 437c and 1008 limit the parties' ability to make renewed motions for summary judgment, they did not limit the court's ability to act on its own motion to correct errors. The court noted that interpreting the statutes to restrict the court's authority to act on its own motion to correct its own errors "might go too far. If interpreted to limit the court's ability to reconsider its own rulings, these statutes might, as one court concluded, 'emasculate the judiciary's core power to decide controversies between parties. The legislative restriction of a court's ability to sua sponte reconsider its own rulings is not merely a reasonable regulation on judicial functions. Instead, such a restriction would directly and materially impair and defeat the court's most basic functions, exercising its discretion to rule upon controversies between the parties and ensuring the orderly administration of justice. Courts are empowered to decide controversies, a power derived from the state constitution. We are hard pressed to conceive of a restriction that goes more directly to the heart of a court's constitutionally mandated functions. . . .' [Citation.]" (*Le Francois v. Goel, supra,* at pp. 1104-1105.)

The principle that the court has the responsibility to adjudicate controversies between the parties and ensure the orderly administration of justice is applicable here. A DVPA restraining order is not set in stone until it expires. It may be modified. The court concluded Knopp did not adequately show inadvertence or mistake in failing to respond to the Fox petition for a restraining order. But under the circumstances of this case, which included Knopp's petition for a restraining order against Fox based in part on conduct occurring since the issuance of the Fox restraining order, the court was carrying out its basic function of adjudicating the controversy between the parties and administering justice by acting on its own motion to consider whether the Fox restraining order should be terminated. (See *Wolf v. Board of Supervisors* (1907) 150 Cal. 285, 288 [suggesting a court may on its own motion dissolve or modify ex parte preliminary injunction when it becomes satisfied the order was improvidently or erroneously made]; *Ward v. McKinsey* (1929) 98 Cal.App. 108, 112.) The nature of the controversy was such

25

that the question was squarely before the court, and was fully litigated. Further, as discussed below, Fox received sufficient notice and opportunity to be heard before the court ruled on the question.

### E. No Prejudicial Due Process Error

We disagree that the court's action deprived Fox of his due process rights to notice and a hearing, whether viewed as the court acting on its own motion or based on its interpretation of Knopp's set-aside motion as also seeking termination of the restraining order. Fox had significant advance notice that the court would consider terminating his restraining order. On October 13, nearly two months before the first day of testimony in the evidentiary hearing, the court twice indicated it would consider whether the Fox restraining order should be terminated. Fox did not object. The trial court's statement was consistent with what was obviously the ultimate goal of Knopp's "set-aside" motion—the dissolution of Fox's restraining order against her—even if it did not explicitly mention "termination" of the order. (See *In re Marriage of Petropoulos* (2001) 91 Cal.App.4th 161, 178.)

Subsequently, during closing arguments, the trial court explicitly stated it understood Knopp's motion as requesting termination of the Fox restraining order. Fox did not object. Instead, he argued the matter. (See *Eliceche v. Federal Land Bank Assn.* (2002) 103 Cal.App.4th 1349, 1375 [errors in notice waived by appearance and argument on merits at hearing].) The evidence presented at the hearing concerned the relationship between the parties, the events leading up to the legal proceedings, and what had happened since the court issued a restraining order against Knopp. Inherent in Knopp's arguments and evidence supporting her request for a restraining order was a contention that she needed protecting from Fox, and that Fox did not need protection from her. These issues were exhaustively briefed and litigated. Even if Fox was unaware until closing arguments that the court might terminate his restraining order, he has not established he was prejudiced by not receiving more advance notice. (*In re Angela C.* (2002) 99 Cal.App.4th 389, 394-395 [harmless error analysis for due process error].)

26

And, under the circumstances, the argument that he did not receive adequate hearing on the issue is without merit. (See *In re Marriage of Petropoulous*, *supra*, at p. 179.)

## F. The Trial Court Did Not Abuse its Discretion in Terminating the Order

We also find no abuse of discretion in the trial court's termination of the Fox restraining order on the merits of the ruling. (*Loeffler, supra,* 174 Cal.App.4th at p. 1505.) As noted above, a court may terminate a DVPA order on a showing of a material change in facts upon which the order was granted, a change in law, or that the ends of justice would be served by dissolution of the order. (*Id.* at p. 1503.) When the court issued the Fox restraining order on July 6, the evidence before it indicated Knopp had, at unspecified times, acted in an angry and confrontational manner with Fox; during the London trip she yelled at Fox, swore at him, perhaps took his watch, and eventually battered him; she filed a "frivolous" restraining order against him which led to serious repercussions such as Fox's homelessness and termination from his job; and she had not permitted him to enter her house or backyard to search for or retrieve his possessions.

All of these facts came into question in the litigation of Knopp's second request for a restraining order. The trial court, upon hearing all of the evidence, did not believe Fox's contention that he feared Knopp in confrontations with her. Substantial evidence supported the trial court's conclusions in Knopp's favor. In Knopp's account, which the trial court credited, Fox had a history of aggressive and violent outbursts against Knopp. He engaged with Knopp physically in London, pinning her against furniture. Despite the London incident, Fox attempted to reconcile with Knopp. But when Knopp asked Fox to move out of her house, he responded with threats of legal action. After securing his own restraining order against Knopp, Fox subsequently contacted her and appeared to be attempting to encounter her at a sporting event she was likely to attend. The court voiced its observation that Fox attempted to demean and humiliate Knopp in court.

Thus, the factual basis of Fox's restraining order was undermined, particularly with respect to his alleged continuing fear of abuse. In addition, in support of his restraining order, Fox had claimed that a primary source of Knopp's abuse and harassment was her pursuit of a temporary restraining order. Yet by the time of the trial

27

court ruling in January 2012, Knopp's temporary restraining order had long since dissolved. There was evidence that since the issuance of Fox's restraining order, Fox had not seen Knopp. Knopp had not contacted him. The two had not spoken. The only evidence of contact between the two parties came from Fox's text and telephone call to Knopp, which he claimed were inadvertent, and the apparent attempted contact by Fox when he attended a UCLA game. This evidence supported a finding that circumstances had sufficiently changed so that Fox no longer had a reasonable fear of abuse or harassment from Knopp. (*Loeffler, supra,* 174 Cal.App.4th at p. 1507.)

The trial court considered the evidence presented as to the parties' relationship, the evidence presented by both sides regarding past altercations, and the events occurring since the issuance of the Fox restraining order. The court determined the evidence supported the issuance of a restraining order against Fox. The court could also reasonably conclude there had been a material change in facts justifying the termination of the restraining order against Knopp, or that the ends of justice would be served by terminating the Fox restraining order. (See *New Tech Developments v. Bank of Nova Scotia* (1987) 191 Cal.App.3d 1065, 1073 [no abuse of discretion in dissolving preliminary injunction where initial issuance was contrary to statutory law; "The ends of justice are not served if the aggrieved parties cannot obtain relief from an improperly issued preliminary injunction."].)

### G. Knopp's Proposed Answer

We need not consider Fox's arguments regarding the filing of Knopp's proposed answer to the Fox petition. Even if the trial court erred in refusing to strike Knopp's proposed answer, the only errors reversible on appeal are prejudicial ones. In light of the testimony at trial, which included the matters asserted in the proposed answer, and the resolution of the proceedings in this case, we fail to see how any error in the court's refusal to strike the proposed answer was one that affected the outcome of the proceedings in any way. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800-801; *Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963; see also *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1526 [trial court is presumed to ignore

material it knows is incompetent or inadmissible; if court states it will ignore evidence, we presume it did so].)

## III. The Trial Court Did Not Err in Denying Fox's Request for Attorney Fees and Restitution/Costs (Appeal 3: B242041)

Fox contends he was entitled to attorney fees and restitution as the prevailing party in his petition for a restraining order against Knopp. He also asserts the trial court prejudicially erred by failing to act on his statement of controverted issues or objections to the court's statement of intended decision. We disagree.

### A. Background

### i. Attorney Fees

Fox sought attorney fees in connection with Knopp's initial May 2011 petition for a DVPA restraining order. According to Fox, he appeared at the June 1 hearing with a written declaration supporting his request for attorney fees and a completed income and expense declaration. However his attorney did not prepare an attorney declaration supporting the request for attorney fees. The court awarded Fox $1,000 in attorney fees (June 1 order).

On July 15, 2011, Fox filed a motion seeking modification of the court's June 1 attorney fee order. Invoking the court's powers under Code of Civil Procedure sections 128, subdivision (a)(8) and 1008, Fox asked the court to modify the June 1 order to make the $1,000 fee payable to Fox instead of to his attorney. He claimed his attorney had failed to enforce the order against Knopp, and Fox had already paid the attorney $2,000. Fox also asked the court to increase the award to $2,000, to correct legal error. Fox asserted the court awarded only $1,000 based on a local rule requiring that an attorney declaration accompany requests for fees in excess of $1,000. Fox contended this rule conflicted with Family Code section 6345, subdivision (a).

The motion to modify was set for hearing on August 11, but was continued. As detailed above, many proceedings took place in the months that followed, but Fox's request for a modification of the June 1 order was not explicitly mentioned again until Fox's closing argument on January 23, 2012. When Fox began to argue regarding the

dissolved temporary restraining order Knopp initially secured against him, the court asked what modification to the attorney fee order Fox was requesting. Fox requested that the court change the amount and make the award payable to him. Knopp's counsel objected that Fox had not complied with local rules.

The court then ruled: "Well, as to changing the payee, I don't have a problem with that, that's fine. I will change it to you, Mr. Fox, but as to the amount, the amount stays at $1,000. That concludes that matter." Fox protested he had not had a chance to argue why the amount should be changed. The court suggested the issue could be argued "sometime today." However, the matter was not raised again until a February 10 hearing. Fox informed the court: "Your Honor, I did note that there were a couple of matters that I believe are unresolved that did not appear on the calendar today that should probably be – I presume they would be heard that same day? . . . . They are in the matter of PQ012078, a motion to modify the court's June 1, 2011, order. I don't believe that one's ever been argued or resolved." The court responded: "Okay. That will be put back on calendar, and argued and resolved on that day." At the next hearing date, the parties largely submitted on their papers. At the conclusion of the hearing, the trial court indicated it would make a "complete written ruling as to everything in all three cases." The eventual written decision did not mention Fox's motion to modify the June 1 order.

### ii. Restitution/Costs

On June 13, 2011, in connection with his petition for a restraining order against Knopp, Fox requested court costs and "payment for costs and services." As detailed above, in an accompanying declaration he sought legal costs, lost earnings, and other costs he attributed to Knopp's "abuse." His request as of June 13 totaled $8,363.12 in "out-of-pocket expenses," and $20,000 per month in lost earnings "going forward." Included in the out-of-pocket expenses was the $2,000 Fox paid to an attorney to defend him against Knopp's temporary restraining order petition.

30

On July 6, Fox filed a supplemental declaration supporting his request for out-of-pocket expenses. He declared his expenses now totaled $9,860.05. At the July 6 hearing, the trial court continued the hearing on Fox's request for costs to August 11. The court ordered Fox to provide Knopp with notice of the restitution hearing.

On July 15, Fox filed a formal motion seeking out-of-pocket expenses and lost earnings. Supporting the motion were his previously-filed declaration and supplemental declaration regarding costs. In the motion, Fox sought $1,000 in attorney fees, $8,090.05 in out-of-pocket expenses, $48,300 in past lost earnings, $20,000 per month in future lost earnings, and $650 in replacement costs for his wristwatch. Fox argued that under Family Code section 6344, Knopp's "tactics" in obtaining a retaliatory temporary restraining order based on false allegations justified a court award of full attorney fees. Fox again argued the trial court erred in awarding only $1,000 at the June 1 hearing.

The court denied Fox's restitution claims in its written statement of decision. The decision included a finding that Knopp prevailed in two of three cases. The court also found Fox "overly litigated" the case, filed non-meritorious motions, and failed to present independent evidence that Knopp caused him to lose his job.[12]

## B. Applicable Legal Principles

Family Code section 6342, subdivision (a) provides, in relevant part: "After notice and a hearing, the court may issue any of the following orders: (1) An order that restitution be paid to the petitioner for loss of earnings and out-of-pocket expenses, including, but not limited to, expenses for medical care and temporary housing, incurred as a direct result of the abuse inflicted by the respondent or any actual physical injuries sustained from the abuse. (2) An order that restitution be paid by the petitioner for out-of-pocket expenses incurred by a party as a result of an ex parte order that is found by the court to have been issued on facts shown at a noticed hearing to be insufficient to support

---

[12]     Although it appears the court did not enter a final formal order, we exercise our discretion to treat the court's written and signed memorandum of decision as a final appealable order. (*Sarah B. v. Floyd B.* (2008) 159 Cal.App.4th 938, 940, fn. 2.)

the order."  Subdivision (b) makes clear however that "[a]n order for restitution under this section shall not include damages for pain and suffering."

Under Family Code section 6344, subdivision (a), "[a]fter notice and a hearing, the court may issue an order for the payment of attorney's fees and costs of the prevailing party."

## C.  Discussion

### i.  The Trial Court Did Not Deny an "Unoppposed Attorney Fee Motion"

Fox asserts the trial court erred in denying his "unopposed fee motion" for $1,000. Yet, no such motion was properly pending before the court.  Fox already had a trial court order requiring Knopp to pay an attorney fee award of $1,000 in connection with her dissolved temporary restraining order.  This was the only matter in which Fox was represented by counsel.  Fox's subsequent motion related to that award was a motion to "modify," which was in essence a motion for reconsideration.  Fox also incorporated the same fee request in his later motions for restitution, which was improper, since he had already been awarded the fees he was requesting, but in an amount he found unsatisfactory.  The trial court was under no obligation to consider the issue anew simply because Fox incorporated the request in a different motion.

The trial court denied Fox's motion to modify the June 1 fee award to increase it to $2,000.  On appeal, Fox does not challenge the trial court's denial of his motion to modify, or reconsider, the previous award.  Instead, he argues only that the trial court should have "awarded" him $1,000 in attorney fees in its final decision.  But the trial court properly refused to ignore the fact that the fees he was requesting were the subject of a prior trial court order.  Fox could not get around the June 1 order by simply asking for the fees again.

### ii.  The Trial Court Did Not Abuse its Discretion in Denying Fox's Restitution Requests

Fox also contends the trial court erred in denying his claims for restitution.  His contentions are premised on the argument that he "prevailed" at three stages of the litigation: when Knopp's first temporary restraining order against him was dissolved after

she failed to appear; when the court issued a restraining order against Knopp; and when the court denied Knopp's motion to set aside Fox's restraining order against her due to her mistake, inadvertence, or surprise.

We reject the idea that under this ultimately misleading characterization of the proceedings, the trial court should have granted Fox's claims for restitution. With respect to Knopp's first petition for a restraining order against Fox, the trial court never found that it was issued on facts shown at a noticed hearing to be insufficient to support the order. (Fam. Code, § 6342, subd. (a)(2).) The order was dissolved because Knopp did not appear to prosecute it. The matter was dismissed without prejudice. No restitution would have been properly awarded in connection with that first petition.

As to Fox's restraining order against Knopp, we need not ignore the reality of what actually occurred. Restitution awards are not mandatory under the DVPA. On his petition for a restraining order against Knopp, Fox was a successful petitioner, for a time. But the trial court terminated the Fox restraining order following a full evidentiary hearing. While Fox's restraining order was granted based on his evidence alone, the order was subsequently terminated after all of the evidence was tested. The trial court, in its role adjudicating a controversy between the parties, did not find Fox credible. We have found no error in the trial court's ruling terminating the restraining order against Knopp. Viewed in this light, Fox did not prevail in any meaningful or practical sense, and the court could reasonably determine no restitution order was appropriate. (See *Graciano v. Robinson Ford Sales Inc.* (2006) 144 Cal.App.4th 140, 150-151 (*Graciano*) [in absence of legislative definition of "prevailing party" court has discretion to make determination on a practical level, analyzing which party realized its litigation objectives]; *Galan v. Wolfriver Holding Corp.* (2000) 80 Cal.App.4th 1124, 1129; *Heather Farms Homeowners Assn. v. Robinson* (1994) 21 Cal.App.4th 1568, 1574; see also *Sole v. Wyner* (2007) 551 U.S. 74, 83, 86 [under 42 U.S.C.A. § 1983, 1988, party who receives preliminary injunction that is eventually reversed or dissolved by final decision in case is not prevailing party for purposes of attorney fees].)

33

We also disagree that the continuance of the hearing on Fox's restitution requests was improper. In light of the significant amount of the requests, the trial court could reasonably postpone ruling on the motions until the issues necessary to a ruling were fully litigated. Consistent with the court's authority to manage its courtroom and efficiently use judicial resources, the court was not required to hear the restitution issues separately from the related issues in the parallel matters. (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1357-1358 [" 'Matters of domestic relations are of the utmost importance to the parties involved and also to the people of the State of California . . . . To this end a trial judge should not determine any issue that is presented for his consideration until he has heard all competent, material, and relevant evidence the parties desire to introduce.' [Citation.]]"; *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967 [courts have inherent authority to manage proceedings and control pending litigation].)

We find no abuse of discretion in the trial court's denial of Fox's motion for restitution.

### iii. The Trial Court's Lack of Explicit Action on Fox's Objections and Statement of Controverted Issues is Not Reversible Error

Following trial on the primary issues raised by Knopp's motion to set aside the Fox restraining order, and her petition for a restraining order against Fox, the court held separate proceedings on the "financial issues." After briefing and argument, the court issued a "memorandum of intended decision on the issue of attorneys' fees and costs." Fox filed a "statement of controverted issues and proposals not covered in tentative decision" and objections to the proposed decision. There is no indication in the record that the court took any explicit action on Fox's objections or statement of controverted issues. On appeal, Fox argues, without detail, that the court abused its discretion "and demonstrated prejudicial bias" in failing to order a hearing on his objections and statement, or otherwise address them. He contends the court's failure to act denied him a "fair, unbiased and well-reasoned decision and the recovery of fees and restitution to which he proved entitlement with uncontradicted evidence."

34

There is no merit to Fox's argument. First, the trial court was not required to issue a statement of decision on the attorney fee award or cost issues. (*In re Marriage of Falcone and Fyke* (2012) 203 Cal.App.4th 964, 981; *In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 293-294.) Thus, even if deficient, we fail to see how any error associated with the statement of decision could be reversible error. But, even assuming the trial court's act in issuing the statement of intended decision required it to comply with the rules of court applicable to formal statements of decision, we still find no reversible error.

Under California Rules of Court, rule 3.1590, subdivision (k): "The court may order a hearing on proposals or objections to a proposed statement of decision or the proposed judgment." The court is not required to hold such a hearing. Similarly, contrary to Fox's assertion, the court was not required to issue a revised statement of decision in response to his objections or his statement of controverted issues. (See Cal. Rules of Court, rule 3.1590, subd. (c) [court may direct that tentative decision will become the statement of decision unless party specifies controverted issues or makes proposals within 10 days; rule does not state requirements for court response to party's submission].) As in all appeals, unless rebutted, there is a presumption that the trial court carries out its duties, including the duty to consider arguments properly presented to it. (Evid. Code, § 664.) In this case, we must construe the court's decision not to formally respond to Fox's objections or statement of controverted issues as simply a rejection of those objections and issues raised.

While better practice might be to expressly deny the objections or reject the claim that the statement of decision failed to resolve specific issues, the failure to do so is not reversible error, particularly where, as here, no statement of decision was required.[13]

---

[13] Even when a statement of decision is required, it "need not address all the legal and factual issues raised by the parties. Instead, it need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its decision. [Citations.] '[A] trial court rendering a statement of decision . . . is required to state only ultimate rather than

**IV. The Trial Court Did Not Abuse its Discretion in Awarding Attorney Fees to Knopp (Appeal 4:B242042)**

Finally, Fox contends the trial court erred in issuing an attorney fee award of $20,000 to Knopp. We find no error. We review an award of attorney fees for abuse of discretion. (*Loeffler, supra,* 174 Cal.App.4th at p. 1509; *Jaffe v. Pacelli* (2008) 165 Cal.App.4th 927, 934; *Graciano, supra,* 144 Cal.App.4th at p. 148.)

Fox's arguments primarily take issue with statements the court made in its intended statement of decision. Based on those statements, Fox argues the court relied on inapposite authority in making the attorney fee award; the statement was confusing and ambiguous; and the court relied on incorrect summaries or characterizations of the proceedings. However, if the record establishes the trial court's ruling is correct on any legal theory, we will affirm the ruling. (*Hoover v. American Income Life Ins. Co.* (2012) 206 Cal.App.4th 1193, 1201.)

Under Family Code section 6344, subdivision (a): "After notice and a hearing, the court may issue an order for the payment of attorney's fees and costs of the prevailing party." Fox contends that even if the trial court issued an award under this subdivision, it was required to consider factors concerning his ability to pay an award, and whether Knopp was unable to pay her own fees. We disagree.

Although subdivision (b) sets forth factors to be considered with respect to mandatory need-based awards, subdivision (a) does not include or reference those factors.[14] " 'In reviewing a statute . . . . [i]f the statutory language is unambiguous,

---

evidentiary facts . . . .' [Citations.] . . . . [The court is] *not* required to address how it resolved intermediate evidentiary conflicts, or respond point by point to the various issues posed in appellant's request for a statement of decision." (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1124-1126.) The trial court's statement met these requirements.

[14] Under subdivision (b) of the section, "[i]n any action in which the petitioner is the prevailing party and cannot afford to pay for the attorney's fees and costs, the court shall, if appropriate based on the parties' respective abilities to pay, order that the respondent pay petitioner's attorney's fees and costs for commencing and maintaining the

'we presume the Legislature meant what it said, and the plain meaning of the statute governs.' [Citation.]" [Citation.]' [Citation.]" (*Conservatorship of Maria B.* (2013) 218 Cal.App.4th 514, 524.) "Where the words of the statute are clear, the court should not add or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history." (*Oriola v. Thaler* (2000) 84 Cal.App.4th 397, 405.)

Subdivisions (a) and (b) of Family Code section 6344 are unambiguous. Subdivision (b) requires the court to consider certain factors when making an award pursuant to that subdivision; subdivision (a) leaves an award in the court's discretion. In light of this clear distinction between the two provisions, we reject Fox's claim that the trial court *must* consider the factors relevant to an award under subdivision (b) when making an award under subdivision (a), or base a fee award primarily on the parties' respective abilities to pay.

Instead, the trial court here properly considered a host of factors in exercising its discretion to award attorney fees to Knopp. These included the complexity of the litigation, the length, Knopp's success, and Fox's "over" litigation. We again note the trial court was not required to be blind to the entire history of litigation between the parties, which, while not technically consolidated, were largely litigated and considered together. But even if we only consider Knopp's petition for a restraining order against Fox, and the evidentiary hearing, we would find no abuse of discretion in the trial court ruling.

The only prerequisite to an award under section 6344, subdivision (a) is that the recipient be the prevailing party. The trial court concluded Knopp was the prevailing party. We will not disturb a trial court's determination of the prevailing party for purposes of awarding attorney fees absent a clear showing of abuse of discretion.

_____

proceeding. Whether the respondent shall be ordered to pay attorney's fees and costs for the prevailing petitioner, and what amount shall be paid, shall be determined based upon (1) the respective incomes and needs of the parties, and (2) any factors affecting the parties' respective abilities to pay." (Fam. Code, § 6344, subd. (b).)

(*Ritter & Ritter, Inc. Pension & Profit Plan v. Churchill Condominium Assn.* (2008) 166 Cal.App.4th 103, 126.) No such abuse appears here. Knopp prevailed on both her petition for a restraining order, and her efforts to have Fox's restraining order against her dissolved. (*Graciano, supra,* 144 Cal.App.4th at pp. 150-151.)

Further, the court's determinations regarding the nature of the litigation were reasonable and supported by the record. Fox contends, for example, that he did not overlitigate the matter. Yet, the record establishes this was a justified characterization of the proceedings. At the evidentiary hearing, Fox spent significant amounts of time attempting to impeach witnesses on minor details, such as what he and Knopp ate for dinner immediately before the London incident, or whether, during a rafting trip in 2009, Fox's brother shared a raft with Knopp and Fox, or rode separately. He similarly spent significant time attempting to impeach Knopp's son based on general "bad" character evidence that was irrelevant to the incident at issue. Fox devoted a portion of his case to eliciting testimony from his current girlfriend, who had no knowledge of his relationship with Knopp. Fox's closing argument spanned three court sessions. When the trial court advised he skip points the court stated would not be important to its decision, Fox continued to argue the points anyway. Thus, when the court indicated that if it issued a restraining order against him it had no discretion not to order him to relinquish any firearms he owned, Fox persisted in arguing "six good reasons" the court should deny the request that he be ordered to relinquish firearms. Even if only considering the hearing on the Knopp petition for a restraining order against Fox, the trial court could reasonably conclude Fox "over-litigated" the matter.

As to the amount, the trial court could reasonably treat Family Code section 6344, subdivision (a) like other fee-shifting statutes. "In so-called fee shifting cases, in which the responsibility to pay attorney fees is statutorily or otherwise transferred from the prevailing plaintiff or class to the defendant, the primary method for establishing the amount of 'reasonable' attorney fees is the lodestar method. The lodestar (or touchstone) is produced by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate. Once the court has fixed the lodestar, it may increase or decrease

that amount by applying a positive or negative 'multiplier' to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented." (*Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 26; see also *PLCM Group Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095-1096 [lodestar approach also appropriate in determining attorney fee award under Civil Code section 1717].)

While the trial court's written ruling identified multiple authorities and legal theories, at least one of them was consistent with this general fee-shifting approach.[15] The court identified Family Code section 6344, subdivision (a) as one basis of its ruling. It identified Knopp as the prevailing party. Knopp's attorney submitted a lodestar-based request for attorney fees, supported by his billing records. The trial court considered factors such as the quality of Knopp's counsel's representation, the complexity of the issues, and the results obtained. The court then awarded Knopp half of the fees she requested. We find no abuse of discretion in this approach.[16]

---

[15]    Even if some of the legal authorities the trial court cited were inapposite, we would not find this to be prejudicial error. These citations were not findings of fact and were immaterial surplusage. (*In re Marriage of Starr* (2010) 189 Cal.App.4th 277, 288.) We also need not address Fox's multiple arguments in which he disagrees with the court's characterization of the proceedings, such as the court's indication that Knopp's counsel tried to narrow the litigation and objected only when necessary, or the court's alleged inaccuracies in describing the proceedings which do not negate the court's analysis as to an award of attorney fees to Knopp as the prevailing party in her petition for a restraining order against Fox. It was not an abuse of discretion for the trial court to refer to the other proceedings in providing a context for its award, even though Knopp's request for fees was based on her success in her action for a restraining order against Fox.

[16]    Because we conclude the trial court properly awarded fees under Family Code section 6344, subdivision (a), we need not consider Fox's argument that the fee award was an impermissible sanction. (*Loeffler, supra,* 174 Cal.App.4th at p. 1508.)

## DISPOSITION

The trial court orders are affirmed.  Respondent to recover her costs on appeal.


                                          BIGELOW, P. J.

We concur:


        RUBIN, J.



        FLIER, J.